| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY** <br> **Caption in Compliance with D.N.J. LBR 9004-2** <br><br> **BROWN & CONNERY, LLP** <br> Donald K. Ludman, Esquire <br> Julie F. Montgomery, Esquire <br> 6 North Broad Street, Suite 100 <br> Woodbury, NJ  08096 <br> (856) 812-8900 <br> (856) 853-9933 FAX <br> dludman@brownconnery.com <br> jmontgomery@brownconnery.com <br> *Attorneys for the New Jersey Judiciary* | |
| In re: <br><br> Bruce A. Piekarsky, <br><br>               Debtor. | Case No.: 22-10450 <br><br> Hearing Date: August 16, 2023, 10:00 a.m. <br><br> Chapter: 13 <br><br> Judge: Rosemary Gambardella |

**BRIEF IN SUPPORT OF MOTION OF THE NEW JERSEY JUDICIARY TO DISMISS THE BANKRUPTCY CASE WITH PREJUDICE**

The New Jersey Judiciary (the "Judiciary"), by and through its undersigned counsel, hereby files this motion for entry of an order dismissing the Chapter 13 bankruptcy (this "Motion") of debtor Bruce A. Piekarsky ("Piekarsky" or the "Debtor"), and in support thereof states as follows:

**INTRODUCTION**

1. Piekarsky previously served as a Special Civil Part Officer ("SCPO") for the Superior Court of New Jersey, Bergen Vicinage, Civil Division, Special Civil Part (the "Bergen Vicinage"). SCPOs serve writs of execution for wages and bank levies for Special Civil Part, which involve lawsuits where the demand is less than $20,000.00.

2. Piekarsky was suspended as a SCPO in October 2019 and terminated in April 2021 following an investigation by the Judiciary that found Piekarsky committed numerous violations

of the Judiciary's Administrative Directives for SCPOs, including, but not limited to, comingling trust funds with his personal funds, using a secondary accounting program to disburse checks and hide transactions, collecting excess commission fees, not disbursing funds to creditors in a timely manner (or sometimes not at all), and a litany of other accounting irregularities and poor recordkeeping practices.

3. Investigations by the Judiciary revealed that Piekarsky misappropriated in excess of $1,481,546.21 from bank levies and wage garnishments in hundreds of cases. That investigation is continuing, and the Judiciary is in the process of obtaining information and evidence on approximately 115 additional cases.

4. Aside from the Judiciary's investigations, law firms representing several judgment creditors sued Piekarsky for the misappropriation of their clients' funds. Piekarsky filed his bankruptcy just before trial was to begin in one of those actions and an answer was due in the other.

5. The information provided to the Court regarding Piekarsky's creditors, the nature of his debts, and his assets is also suspect. Neither his creditor matrix nor bankruptcy schedules disclose the hundreds of creditors from whom he misappropriated funds. In addition, Piekarsky's bankruptcy schedules depict only modest monthly disposable income while failing to account for assets in excess of $1.48 million (which amount will likely increase through the Judiciary's continued investigation).

6. Piekarsky's failure to identify numerous creditors and failure to disclose significant assets and liabilities demonstrates his lack of transparency, bad faith, and a total disregard for the bankruptcy process. Piekarsky's fraud cannot be countenanced, and he should not be able to use the bankruptcy process to, *inter alia*, (1) obtain a discharge of obligations to his noticed creditors,

including the bonding companies who may ultimately be liable for his debts, while failing to disclose the disposition of over $1.48 million in fraudulently obtained assets, (2) force unnoticed creditors, whose debts arose from his fraud, to engage in legal battles over the nature of the discharge, and (3) to transfer real property to his non-debtor spouse, and beyond the reach of the majority of his (unnoticed) creditors. For these reasons, this case should be dismissed with prejudice.

## JURISDICTION

7. This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the standing order of reference in this district.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

9. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G). If this Court determines that this is a matter related to the bankruptcy proceeding pursuant to 28 U.S.C. § 157(c), the Judiciary consents to entry of order by this Court.

10. The statutory predicate for this Motion is 11 U.S.C. § 1307(c).

## FACTS AND PROCEDURAL HISTORY

### A. Piekarsky's Employment as a Special Civil Part Officer and Related Accounting Requirements

11. Beginning prior to 2013, Piekarsky worked as a SCPO for the Bergen Vicinage. See Declaration of Marita Annichiarico (the "Annichiarico Decl.") ¶ 3.

12. SCPOs are independent appointees designated by a Vicinage to assist with various pre- and post-judgment services in the Special Civil Part of the Law Division. See Declaration of John Brodowski (the "Brodowski Decl.") ¶ 3.

13. SCPOs serve writs of execution for wages and bank levies for Special Civil Part cases. SCPOs are also responsible for collecting wage garnishments from employers and levied

3

funds from banks. SCPOs are expected to receive payments under those writs and then transmit the funds to creditors. See id.

14. The conduct and activities of SCPOs are governed by Administrative Directives issued by the Judiciary. Their commissions are governed by statute, which establishes a fee schedule and a ten percent commission on collections. See id. ¶ 4.

15. SCPOs are subject to stringent accounting and auditing requirements per directive issued by the Judiciary. See id. ¶¶ 5-6, Exhibit A.

16. SCPOs are required to maintain a trust account for collections received from debtors or employers, timely disburse funds to creditors, retain only the statutorily designated commission fees, maintain an accurate computerized accounting system, comply with a trust account reconciliation process, submit an annual financial examination report, and maintain a surety bond to guarantee performance. See id. ¶ 7.

17. SCPOs are also required to submit annual audits conducted by an independent audit firm, as well as monthly reconciliation statements for trust accounts. See id. ¶ 10.

**B. The Reconciliation, Auditing, and Report by the Judiciary's Internal Audit & Control Unit and Termination of Piekarsky**

18. In or around September 2019, the New Jersey Judiciary's Internal Audit & Control Unit (the "IACU") received a joint request from the Bergen Vicinage and Piekarsky to review Piekarsky's reconciliation process and to provide training to Piekarsky to improve his accounting practices. The Bergen Vicinage advised the IACU that Piekarsky's 2018 and 2019 annual audits were not properly reconciled and that there were fluctuations with the unreconciled difference presented in his monthly reconciliation statements. See Brodowski Decl. ¶ 10.

19. The IACU discovered: 1) six unauthorized, unrecorded transfers were made between October 2018 and February 2019, which Piekarsky described as errors; 2) Piekarsky had

4

been taken monthly commissions a month before receiving payment; 3) commission checks were being generated from a separate QuickBooks accounting system, and then entered at a later date into his Daragon Accounting System; 4) the trust account was not reimbursed for bank fees; and 5) accounting records were not accurately maintained. See id. ¶ 11.

20. Piekarsky was initially suspended from receiving any new collection work for sixty days; such suspension ultimately continued indefinitely. He was also required to open a new bank account and begin using only that account. Piekarsky also agreed to begin correcting errors in his prior trust account. See id. ¶ 12.

21. Piekarsky was also required to present detailed bank deposit information for all deposits made between July 1, 2019, and September 30, 2019. See id.

22. In or about January 2020, Piekarsky submitted the detailed bank deposit information. This information allowed the IACU to scrutinize his conduct in more detail, and I prepared a report to summarize my findings based on this additional information. See id. ¶ 14.

23. On January 26, 2021, the IACU issued a report (the "2021 IACU Report") that found Piekarsky committed the following violations: commingling trust funds with personal funds, using a secondary accounting program to disburse checks to hide transactions, retaining excess commission fees, making unauthorized wire transfers to personal accounts, recording receipts for the incorrect cases, untimely depositing funds, inaccurately preparing reconciliations to allow errors and erroneous disbursements to go undetected, failing to reimburse bank service fees and shortages due to posting errors in an untimely manner, not disbursing funds to creditors in a timely manner (and sometimes not disbursing funds to creditors at all), not escheating unclaimed funds, and not maintaining accurate accounting records. See id. ¶ 15, Exhibit B.

24. In addition to the violations, the 2021 IACU Report noted other observations that went unexplained. Specifically, the report found that Piekarsky would post check information to future dates, delete the information before disbursement, and then post the information again. It also observed that checks were recorded and cashed, and then deleted in the accounting system prior to disbursement. See id. ¶ 16.

25. The 2021 IACU Report found discrepancies between the pending trust fund disbursements as of December 31, 2020, and the funds available for disbursement, in both Piekarsky's prior account and the more recently established account. In January 2021, the total deficit was found to be $22,893.79 (reflecting a deficit of $19,962.71 in the prior account, plus a deficit of $2,930.68 in the new account). See id. ¶ 17.

26. Based on the 2021 IACU Report's findings, in March 2021, the Bergen Vicinage terminated Piekarsky's appointment. As a result of the orders terminating his appointment and requiring Piekarsky to hand over his records and accounting system to the Judiciary, the IACU had greater access to Piekarsky's accounting and banking records. The 2021 IACU Report's findings were revised accordingly. On July 26, 2021, the total account deficit was revised to $40,484 (reflecting a deficit of $19,969 in the prior account, plus a deficit of $20,515 in the new account). See id. ¶ 18.

27. Following Piekarsky's termination as a SCPO, on March 22, 2021, the Attorney General's Office filed an order to show cause on behalf of the Bergen Vicinage to transfer custody and control of Piekarsky's trust account to the Bergen Vicinage and to compel Piekarsky to surrender his accounting and banking records to the Bergen Vicinage. Piekarsky cooperated in those efforts and a Consent Order was entered on May 24, 2021 (the "2021 Consent Order"). See Annichiarico Decl. ¶ 4, Exhibit A.

### C. The Bergen Vicinage's Administration, Review, and Findings Regarding Collection Matters Assigned to Piekarsky

28. Pursuant to the 2021 Consent Order, the Bergen Vicinage assumed responsibility for administering the collection matters previously assigned to Piekarsky. The Bergen Vicinage also gained access to Piekarsky's Daragon Accounting System as a result of the 2021 Consent Order. Daragon is the software platform used by SCPOs in Bergen to, among other things, enter individual payments received from banks (pursuant to bank levies) or employers (pursuant to wage garnishments) for each writ of execution they are collecting upon. SCPOs also use their Daragon systems to apply received payments towards judgment balances in the system and track judgment balance amounts. See Annichiarico Decl. ¶ 5.

29. The Bergen Vicinage then, as is its practice, assembled a team to process that SCPO's open writs of execution and administer or transition those matters to a new SCPO, as appropriate. See id. ¶ 6.

30. At the time of Piekarsky's termination, he was administering over five thousand active chattel and wage garnishment executions. A "chattel" execution refers to a writ of execution issued against a bank account or other assets. When a "chattel" execution is against a bank account, it is also known and referred to as a bank levy. See id. ¶ 7.

31. As of May 2021, the Bergen Vicinage was aware of serious discrepancies between the writs that Piekarsky executed against chattels, and the judgment balances for those cases. See id. ¶ 8.

32. Based on Piekarsky's Daragon Accounting System, the Bergen Vicinage knew that in many bank levy cases, Piekarsky had entered and then deleted checks from Daragon, and that creditors had filed turnover motions. The Bergen Vicinage decided not to transition any chattles to new SCPOs. Instead, the Bergen Vicinage began investigating all the chattels to determine

7

amounts paid by the banks and/or defendants, received by Piekarsky, and transmitted (or not transmitted) to the creditors.  See id. ¶ 9.

33.    In or around August 2021, the Bergen Vicinage received information from SCPOs who had been assigned Piekarsky's wage garnishment executions that employers were objecting to providing additional payments, claiming that the writs were already paid off.  This led the Bergen Vicinage to suspect that the wage garnishment collections and chattel executions also contained discrepancies.  As a result of that information, the Bergen Vicinage ceased transitioning any wage garnishments and chattels to new SCPOs.  See id. ¶ 11.

34.    Due to the suspected scope of the issues, the Bergen Vicinage decided to review the records for every collection matter that had been assigned to Piekarsky, including both chattels and garnishments, to identify any discrepancies between the information set forth in his Daragon Accounting System, amounts paid by judgment debtors, amounts received by creditors, and the balances on the judgments.  See id. ¶ 12.

35.    This investigation required, on a case-by-case basis, obtaining payment history information from banks, employers, and defendants to determine the amounts delivered to and either cashed or deposited by Piekarsky, and inquiring with creditors as to whether they received those payments.  See id. ¶ 13.

36.    The investigation also involved sending to creditor attorneys spreadsheets containing collection and judgment balance information based on Piekarsky's records and the team's findings, and asking the creditors to identify any discrepancies with the amounts they received from Piekarsky.  See id. ¶ 14.

37. In cases where the Bergen Vicinage identified a discrepancy, the Vicinage advised creditors and their attorneys to file motions to credit the defendant, transition the writ of execution to a new SCPO, and support a claim to the bond company. See id. ¶ 15.

38. Additionally, the Bergen Vicinage issued a Notice to the Bar in January 2022, stating the following:

> In April 2021, the Bergen Vicinage assumed responsibility for the administration of the collection matters previously assigned to former Special Civil Part Officer Bruce Piekarsky. The Vicinage is in the process of contacting creditors and/or attorney creditor firms; defendants and/or defendants' employers; and financial institutions to obtain necessary information/documentation to reconcile collection data and judgment balances on writs previously assigned to Officer Piekarsky. In cases where collection data and judgment balances cannot be reconciled, the Vicinage will direct that a motion be filed before the Court, on notice to the parties of the action, so that a Court order can be entered as to the balance owed on the judgment. Any party filing such a motion may request the Court to refund the filing fee or request for said fee to be included in the amount(s) potentially claimed against the bond(s) of Officer Piekarsky. As the Vicinage is the insured party under Officer Piekarsky's bond(s), claims on behalf of litigants will be filed by the Administrative Office of the Courts with the bonding company utilizing the aforementioned Court order(s).

See id. ¶ 16, Exhibit B.

39. Creditors began to file motions in bank levy and garnishment cases, which made it apparent that in many bank levy and garnishment cases, payment checks were sent to Piekarsky by banks and employers, and cashed by Piekarsky, but not transmitted to the creditors. See id. ¶¶ 18-19.

40. Due to the discrepancies in Piekarsky's trust accounts, and the wide-ranging (in terms of volume and dollar amount) discrepancies in many individual cases, it became apparent that the missing funds could not all be located in his trust accounts. See id. ¶ 20.

41. For cases involving a bank levy, the Bergen Vicinage was able to obtain copies of cleared checks from the banks to confirm that the checks were issued, and subsequently cashed and/or deposited. In many of those cases, the check was never entered or applied towards the judgment in Piekarsky's Daragon Accounting System, and the creditor informed the court that they never received any payment. See id. ¶¶ 21 – 22, Exhibit C.

42. In other cases where the judgment was collected by bank levy, the Bergen Vicinage was able to obtain copies of checks that were deposited, entered into Piekarsky's Daragon Accounting System, but subsequently deleted and never credited towards the judgment. See id. ¶¶ 23 – 24, Exhibit D.

43. The Bergen Vicinage found that cases involving wage garnishments were often far more complicated. Those cases involved a series of payments from employers on behalf of judgment debtors that occurred over a period of time. Many cases involved Piekarsky entering and then deleting some checks, never entering other checks at all, and entering and then never applying or disbursing other checks. See id. ¶¶ 25 – 26, Exhibit E.

44. To expedite and assist the process of obtaining payment information from employers and banks, in or about June 2022, the Bergen Vicinage began sending subpoenas to banking institutions and employers to obtain documentation regarding payment histories made to Piekarsky pursuant to levies and garnishment orders. The purpose of these subpoenas was to cross-reference and identify discrepancies between those histories, the writ balances, the amounts received by creditors, and the information contained in Piekarsky's Daragon Accounting System. See id. ¶ 27.

45. Although the Bergen Vicinage received judgment debtor information from many of the subpoenas, not all parties to whom subpoenas were issued were compliant, and some were no longer in existence or could not locate the information requested. See id. ¶ 28.

46. In or around January 2023, with approximately 468 wage garnishment cases and 250 bank levy cases remaining, rather than continuing to wait for the parties to file motions in every case, the Bergen Vicinage began reconciling the remaining cases via an "Omnibus Order" process. As part of that process, the Bergen Vicinage sent letters to judgment debtors and creditors seeking confirmation, in each case, of the amount of judgment, total payments made by the judgment debtor, total amounts received by the creditor, and the unpaid balance of the judgment. For cases in which the parties did not object to the amounts set forth in the Bergen Vicinage's letter, or file motions, the court issued an Omnibus Order after the time for response for that month's orders had passed. See id. ¶¶ 29 – 33.

47. Each monthly Omnibus Order verified the total debtor losses, total creditor losses, and the amounts to be credited toward the judgment in each case that received letters in the associated month. Each Order also provided the parties an additional opportunity to object to any of the amounts listed therein. See id. ¶ 34.

48. The Omnibus Order process further confirmed that Piekarsky was receiving and cashing checks, and then not transmitting the funds to creditors. See id. ¶¶ 35 – 37, Exhibits F and G.

49. As a result of the Bergen Vicinage's investigation, motion practice in individual cases, and the Omnibus Order process, the Bergen Vicinage has been able to obtain proofs that Piekarsky received funds from banks and employers pursuant to writs of execution, and did not transmit those funds to the proper parties, in hundreds of cases he handled. The examples set forth

11

in paragraphs 22, 24, 26, 36, and 37 of the Annichiarico Decl. are demonstrative examples of the findings revealed by the Vicinage's investigation across hundreds of cases handled by Piekarsky. As of May 31, 2023, evidence has been obtained in approximately 714 wage garnishments, and 284 chattels. The discrepancies in those cases are supported by evidence of payment histories from banks or employers, and many cases are further supported with either a court order that resulted from motion practice, or an Omnibus Order. See id. ¶ 38. A list of these cases, by name of the judgment debtor (the "Affected Judgment Debtors") is attached to the Annichiarico Decl. as Exhibit "H."

50. Based on the Bergen Vicinage's investigation and records obtained to date, the Judiciary currently estimates that, for the matters handled by Piekarsky, the missing debtor payments from chattles is $467,946.83, and the amount missing debtor payments from wage garnishments is $1,013,599.38 from wage garnishments. The total is $1,481,546.21. See Annichiarico Decl. ¶ 39.

51. The Bergen Vicinage is still in the process of obtaining information and evidence on approximately 115 cases, which will likely increase the figures set forth in the preceding paragraph. See id. ¶ 40.

52. Piekarsky's conduct has thus financially impacted judgment debtors and creditors in hundreds of Special Civil Part cases. See id. ¶ 41.

### D. Creditor State Court Actions Against Piekarsky

53. On October 6, 2020, Chatfield & Sigels, Esqs., filed a Complaint (the "Chatfield Complaint") against Piekarsky, alleging that it obtained a judgment and wage garnishment against a judgment debtor, and further alleging that the judgment debtors' employer confirmed that $3,717.20—the entire amount of the writ—had been paid to Piekarsky. See Declaration of Julie

F. Montgomery (the "Montgomery Decl.") ¶ 2, Exhibit A. Of that amount, however, Chatfield allegedly received only $1,572.37. Id. The filing of the Chatfield Complaint commenced an action in the Superior Court of New Jersey, Docket No. BER-DC-10819-20 (the "Chatfield Matter"), which was subsequently transferred to Passaic County, Docket No. PAS-DC-8054-20. See id. ¶ 3, Exhibit B.

54. On November 2, 2020, Piekarsky filed an answer, denying liability of all claims asserted against him under various counts of the Chatfield Complaint. See id. ¶ 4, Exhibit C.

55. On November 22, 2021, the court scheduled a trial in the Chatfield Matter to commence on January 20, 2022. On January 20, 2022, Mr. Piekarsky filed a Notice of Bankruptcy in the Chatfield Matter, having filed his bankruptcy petition the prior day. See id. ¶ 3, Exhibit B.

56. On December 14, 2021, Pressler, Felt & Warshaw, LLP (the "Pressler Firm") filed a complaint against certain defendants, including Piekarsky, alleging that Mr. Piekarsky unlawfully absconded or retained funds that were "directed to Mr. Piekarsky to be credited towards those judgments obtained by [the Pressler Firm] on behalf of its clients." (the "Pressler Complaint"). See id. ¶ 5, Exhibit D. The filing of the Pressler Complaint commenced an action in the Superior Court of New Jersey, Docket No. BER-L-8156-21 (the "Pressler Matter"). See id. ¶ 6, Exhibit E.

57. Mr. Piekarsky never filed an answer or other response to the Pressler Complaint, as this bankruptcy was filed 36 days after filing of the Pressler Complaint. See id.

### E. The Bankruptcy Filing

58. On January 19, 2022, Piekarsky filed his Chapter 13 petition.

59. On February 7, 2022, Piekarsky filed certain Schedules of Assets and Liabilities [Doc. No. 12]. These schedules did not include the names of any of the Affected Judgment Debtors, nor did they include the Pressler Firm.

60. On March 14, 2022, Piekarsky filed amended Schedules of Liabilities, improperly docketed as "Amendment to List of Creditors" [Doc. No. 25]. These schedules did not include the names of any of the Affected Judgment Debtors, but the Pressler Firm was included on its Schedule E/F with a $0.00 contingent and disputed claim.

61. On March 25, 2022, the Pressler Firm filed an adversary complaint against Piekarsky (the "<u>Pressler Adversary Complaint</u>") commencing Adversary Proceeding No. 22-1083, which contained allegations substantially similar to those in the Pressler Complaint [Adv. Proc. Doc. No. 1].

62. On April 22, 2022, Piekarsky filed an answer denying liability of all claims asserted against him under various counts of the Pressler Adversary Complaint [Adv. Proc. Doc. No. 4].

63. On May 6, 2022, Piekarsky filed further amended Schedules of Liabilities, again improperly docketed as "Amendment to List of Creditors" [Doc. No. 56]. These schedules did not include the names of any of the Affected Judgment Debtors.

64. On March 1, 2023, Piekarsky filed a motion [Doc. No. 122] to sell two parcels of real property that are depicted in his Schedules: (1) a property in Cliffside Park, NJ, and (2) a property in Ft. Lauderdale, FL. Pursuant to this sale motion and the relief requested therein, on May 24, 2023, the Court entered an order [Doc. No. 143] authorizing Piekarsky to sell both properties, and further ordered that (i) the proceeds of the sale from the Cliffside Park, NJ property, including those of the non-debtor spouse, be paid to the Chapter 13 Trustee, and (ii) that in exchange for the non-debtor spouse's proceeds being paid to the Chapter 13 Trustee, Piekarsky

was authorized to transfer his interest in the Ft. Lauderdale, FL property to his non-debtor spouse. Therefore, Piekarsky sought successfully to use the bankruptcy to transfer real property to his non-debtor spouse, and beyond the reach of the majority of his (unnoticed) creditors.

**LEGAL ARGUMENT**

I. **CAUSE EXISTS FOR DISMISSAL BASED UPON THE BAD FAITH FILING OF THE PETITION**

65.    Section 1307(c) of the Bankruptcy Code provides that a Chapter 13 case may be dismissed "for cause." 11 U.S.C. § 1307(c). The phrase "for cause" is not defined in the statute, but courts have concluded that "cause" includes a lack of good faith in filing a petition under Chapter 13 of the Bankruptcy Code. See Marrama v. Citizens Bank of Mass., 549 U.S. 365, 373 (2007) ("Bankruptcy courts . . . routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words 'for cause.'"); In re Myers, 491 F.3d 120, 125 (3d Cir. 2007) ("A bankruptcy filing made in bad faith may be dismissed 'for cause' under 11 U.S.C. § 1307(c), although § 1307(c) does not explicitly mention the good faith requirement."); In re Caola, 422 B.R. 13, 16 n.3 (Bankr. D.N.J. 2010); In re Dahlgren, 418 B.R. 852, 855 (Bankr. D.N.J. 2009) ("The Third Circuit recognizes lack of good faith as 'cause' for purposes of Section 1307."). A debtor must also file a Chapter 13 plan in good faith. 11 U.S.C. § 1325 (a)(7); see also In re Scotto-DiClemente, 459 B.R. 558, 562 (Bankr. D.N.J. 2011).

66.    In In re Lilley, the Third Circuit joined the Seventh, Ninth and Tenth Circuits to hold that a "lack of good faith in filing is sufficient cause for dismissal under section 1307(c)." 91 F.3d 491, 496 (3d Cir. 1996) (citing In re Love, 957 F.2d 1350, 1354 (7th Cir. 1992); In re Eisen, 14 F.3d 469, 470 (9th Cir. 1994); In re Gier, 986 F.2d 1326, 1329-30 (10th Cir. 1993)). Recognizing that good faith "'is a term incapable of precise definition,'" the Third Circuit

15

concluded that the assessment must be made on a "case-by-case basis in light of the totality of the circumstances." Id.

67. The assessment, by necessity, is a fact intensive determination. In re Myers, 491 F.3d at 125. In making this determination, courts have considered, among other factors:

> (1) The nature of the debt;
> (2) The timing of the petition;
> (3) How the debt arose;
> (4) The debtor's motive in filing the petition;
> (5) How the debtor's actions affected creditors;
> (6) The debtor's treatment of creditors both before and after the petition was filed; and
> (7) Whether the debtor has been forthcoming with the bankruptcy court and the creditors.

Id. (citing to In re Lilley, 91 F.3d at 496); see also In re Falotico, 231 B.R. 35, 40 (Bankr. D.N.J. 1999). In Marrama, the Supreme Court did not "articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7," 549 U.S. at 375 n.11, but the Court did remark that "[i]t suffices to emphasize that the debtor's conduct must, in fact, be atypical." Id. The Court may take other relevant aspects into consideration, as no one factor is controlling. In re Goddard, 212 B.R 233, 238 (D.N.J. 1997).

### i. Whether the Debtor has been Forthcoming with the Bankruptcy Court and the Creditors

68. While this is the final factor in this analysis, it should perhaps be considered first. Of the over 700 judgment debtors identified by the Judiciary, none were included by Mr. Piekarsky as creditors in his schedules. The Pressler Firm was included as a creditor on the eve of Mr. Piekarsky's section 341 hearing, with a $0.00 debt marked as "disputed."

69. Mr. Piekarsky's schedules state that he is the owner of real property valued at $726,806.22, and of personalty valued at $33,000.00.

16

70. At no point during the course of this bankruptcy has Mr. Piekarsky disclosed the hundreds of potential creditors from whom he embezzled well over a million dollars, nor has he disclosed assets that would indicate that he is possession of, or what he did with, the no less than $1,481,546.21 that he fraudulently absconded with.

71. Through this bankruptcy, Mr. Piekarsky has sought and obtained Court approval to sell certain real property in New Jersey, with the net proceeds to be paid to those creditors he has named, while transferring his interest in his real property in Florida to his spouse, which would put it beyond the reach of his individual creditors.

72. This factor weighs in favor of dismissal.

## ii.  (1) The Nature of the Debt and (2) How the Debt Arose

73. The vast majority of the Piekarsky's scheduled debts are typical for a debtor filing a Chapter 13 Plan. However, the claim filed by The Ohio Casualty Insurance Company, and the debts of the "Affected Judgment Debtors," arose out the fraud and embezzlement of the Debtor. Such malfeasance was perpetrated while the Debtor was working as an independent contractor for, and under the guise as a representative of, the New Jersey Judiciary. These factors weighs in favor of dismissal.

## iii. The Timing of the Bankruptcy Petition

74. The petition was filed on the eve of trial in the Chatfield Matter, and approximately one month after the Pressler Complaint was filed. The Debtor clearly intended to force those claimants to slow their potential recovery, and to potentially discharge the debts of those claimants—debts, again, perpetrated by fraud. While it is acknowledged that a Debtor may experience the financial strain brought about by litigation, the Debtor's denial of allegations in the

Adversary Complaint is indicative of an individual who sought the protections of the Bankruptcy Code in bad faith. This factor weighs in favor of dismissal.

### iv. The Debtor's Motive in Filing the Petition

75. Given the timing of the petition, it appears that Piekarsky seeks to discharge those defrauded creditors that have been most active in pursuing claims against him. While Piekarsky's schedules do not appear to contain the names of the multiple individuals and companies whose funds were blatantly misappropriated by Piekarsky, it is presumed that Piekarsky included and seeks to discharge all the victims whom he could recollect. Moreover, during the bankruptcy, Piekarsky sought to shield assets from creditors by transferring real property to his spouse.

### v. How the Debtor's Actions Affected Creditors

76. Piekarsky misappropriated nearly $1.5 million of payment from judgment debtors and creditors, such funds rightly belonging to judgment creditors. As there are still over 100 cases being investigated by the Judiciary for which it is awaiting information and records, that number is expected to increase. The Judiciary has spent valuable time and resources investigating Piekarsky's actions and unravelling his widespread fraud. Piekarsky's bonding companies may be required to pay out significant sums in damages to the Judiciary and litigants. The financial burdens placed upon innumerable actors as result of Piekarsky's misconduct and theft of funds is significant.

## II. THE BAD FAITH EXHIBITED BY THE DEBTOR IS CAUSE FOR DISMISSAL OF THIS CASE WITH PREJUDICE

77. Furthermore, the bad faith exhibited by Piekarsky in filing his bankruptcy petition is cause for dismissal with prejudice pursuant to 11 U.S.C. §§ 349(a) and 105.

78. Section 349(a) provides that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar a discharge, in a later case under this title, of debts

that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title." 11 U.S.C. § 349(a).

79. Courts have held that the filing of a petition in bad faith constitutes cause for dismissal with prejudice. See In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 304 (Bankr. D. Del. 2011) (dismissing bad faith filing under Section 1112(b) with prejudice)(citing In re Casse, 198 F.3d 327, 336–39 (2d Cir.1999)).

**WHEREFORE**, the New Jersey Judiciary respectfully requests that this Court (i) enter the Proposed Order dismissing Bruce A. Piekarsky's bankruptcy with prejudice pursuant to 11 U.S.C. § 1307(c) and 11 U.S.C. §§ 349(a) and 105, and (ii) grant such other and further relief as the Court may deem proper.

Dated: July 18, 2023

By: */s/ Donald K. Ludman*
Donald K. Ludman, Esquire
Julie F. Montgomery, Esquire
6 North Broad Street, Suite 100
Woodbury, NJ  08096
(856) 812-8900
(856) 853-9933 FAX
dludman@brownconnery.com
jmontgomery@brownconnery.com

*Attorneys for the New Jersey Judiciary*